FILED & ENTERED

OCT 17 2014

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Fisher    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>John Michael Licursi<br>Susan Annette Licursi<br><br><br><br><br>Debtor(s). | Case No.: 1:10-bk-26168-GM<br><br>CHAPTER 11<br><br>**AMENDED MEMORANDUM OF OPINION ON DEBTORS' MOTION OBJECTING TO SECURED CLAIM OF CALIFORNIA BANK & TRUST**<br><br>Date:    September 9, 2014<br>Time:    10:00 a.m.<br>Courtroom:  303 |

One of the principal issues in this case is the amount of the secured claim of California Bank & Trust (CB&T), specifically the sum of attorneys' fees to which the bank is entitled. So that the Debtors could have an approximate figure to us in their disclosure statement and for purposes of refinancing, the Court prepared a Partial Ruling on Debtors' Motion Objecting to Secured Claim of California Bank & Trust (dkt. #402). This did not deal with the objections to interest, foreclosure fees, etc. and the Court requested further briefing on those matters, which was received from both sides

*(dkt. ## 405, 406). The Debtors also filed Comments on the Partial Ruling along with an analysis and charts (dkt. ## 407, 408) and CB&T filed a supplemental brief in support of its response to the objection (dkt. #409).*

*Having reviewed all of these newly filed papers, the Court hereby issues its final ruling on the objection to claim #22. The charts created and used by the Court are those attached to the Partial Ruling (dkt. #402). For convenience of the parties, any changes to the Partial Ruling are indicated by strike-outs (deletions) or underlined text (additions). To the extent that corrections are not made to the Partial Ruling, the objections thereto are overruled.*

*THE AMENDED MEMORANDUM AND ORDER ARE CHANGED FROM THE ORIGINAL ONLY TO INCLUDE A FIGURE FOR INTEREST TO AUGUST 25, 2014, WHICH WAS INADVERTENTLY LEFT OUT OF THE ORIGINAL RULING.*

### **THE MEMORANDUM**

On December 28, 2010 John and Susan Licursi filed this case under chapter 11 of the bankruptcy code. At that time they had three types of legal relations with California Bank & Trust: a guaranty for their business Spectrum Glass & Aluminum, Inc. (which resulted in actions in the superior court against Spectrum Glass & Aluminum, Inc. and the Licursis on the note and guaranty as well as an action in the superior court against Spectrum Glass & Mirror, Inc. seeking stock, etc.), a second deed of trust on Debtors' business property on Burbank Blvd., and a first deed of trust on a piece of vacant land in Malibu.

The Burbank Blvd. property was sold during the bankruptcy with no payment to CB&T on its second trust deed. Because the deeds of trust were not cross-

collateralized, the sale of this property resulted in an unsecured claim for the deficiency on the Burbank Blvd. loan.

The remaining secured claim is due to ~~a~~ <u>the</u> first trust deed on vacant land in Malibu.  Because the various loans were not cross-collateralized, the Debtors agree that while they owe attorneys' fees and interest on the claim secured by the Malibu property, they assert that they do not owe such monies as to work done on the Burbank Blvd. portion of the claim or the superior court action on the guaranty.

CB&T does not dispute that it is not entitled to have a lien on Malibu for fees and interest arising from the Burbank Blvd. portion of the claim or for the superior court action or the adversary proceedings that took place or <u>were</u> due to its sanctions motion .

The Debtors are now trying to refinance the Malibu property, pay CB&T off, and move forward to confirm a plan.  The Debtors argue that the CB&T proof of claim is a "moving target" and that this causes a problem in obtaining the financing.  As of May 1, 2014, CB&T was seeking a total of $341,594.08, of which ~~$175,407.58~~ <u>$172,776.44</u> was for principal, $92,533.17 was legal fees through April 30, 2014, $38,965.98 was interest and another $26,910.54 was default interest.  [According to CB&T, the figures for interest and attorneys' fees have increased and as of August 25, 2014 they are as follows: interest of $42,852.98; default interest of $26,910.54; legal fees of $101,795.88. (dkt. 385)]  The Debtors assert that the total fees attributable exclusively to Malibu are no more than $56,683.84 as of August 25, 2014.[1]

In support of the objection, the Debtors prepared a detailed analysis of the fee

---

[1] On the objection to claim, the Debtors asserted a maximum of $46,123.69 as of May 1, 2014. (dkt. 352). Thereafter in late September they provided the Court with an amended spreadsheet that took into account the total up to August 25, 2014. ~~This amended spreadsheet has not been actually filed and is not on the docket.~~ <u>At the time of the Partial Ruling, the amended spreadsheet has not been actually filed with the court.  Since that time, it was added to the docket as part of #408.</u> The amounts through August 25, 2014 are set forth on the attached exhibits.

-3-

request and ask for a credit against CB&T's claim in the amount of at least $27,450 ($22,500 for Ms. Licursi's time and $4,950 for counsel's time). Thus Debtors assert that the amount of fees payable to CB&T as of August 25, 2014 should be $29,233.84.

Debtors also recalculate the default <u>interest</u> and they dispute the late charges in that the account was current as of the petition date and post-petition late charges may not be allowable. As to foreclosure fees, the Debtors assert that the NOD was filed erroneously by CB&T and that some appraisal fees are not substantiated. (dkt. 352, ex. G)

In response, Buchalter Neimer (BN), CB&T's attorney, presented a chart showing that it had actually adjusted the amounts and thus had reduced its fees from the total of $209,658 to the amount that it is requesting of $101,795.88 (dkt. 385, p. 5). The amounts removed covered litigation fees of $60,759 related to the state court actions against the Debtors' prior and present businesses; $25,814.50 incurred in defending the Debtors' adversary proceedings; $14,875.88 in seeking sanctions against the Debtors' third bankruptcy counsel; and $4,854.25 for fees attributable to the disposition of the Debtors' Burbank and Studio City properties.

The parties agree that the loan documents permit CB&T to receive its fees and costs:

> **Attorneys' Fees; Expenses.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law. [From the Note]
>
> **Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Deed of Trust, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not

prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance and fees for the Trustee, to the extent permitted by applicable law. Trustor also will pay any court costs, in addition to all other sums provided by law. [From the Deed of Trust]

The background and hostility of this case are important. On April 29, 2011, CB&T filed claim #16 for a total of $649,155.82. This was stated to be completely secured, although it was shown as two separate loans [one in the principal amount of $360,263.96 (the business loan) and the other with a principal of $175,407.58 to the John and Susan Licursi 2005 Trust Dated April 13, 1005 (the Malibu loan)].[2] On September 13, 2011 the Court entered an order granting the Debtors' motion to sell the Burbank Blvd. property free and clear of liens. (doc. #61). Zions Bank, the holder of the first trust deed on Burbank Blvd., received payment, but little or nothing was left for CB&T's second trust deed.

CB&T did not amend its claim and on March 14, 2013 the Debtors filed their objection. In response, on May 13, 2013 CB&T filed claim #22-1 (amending claim 16-1), which it immediately amended with claim #22-2. It divided the claim between secured and unsecured portions and asserted a secured claim against Malibu in the amount of $180,728.41 as of the date that the case was filed. Debtors objected on June 17, 2014 and on August 1, 2014 CB&T filed claim #22-3 in order to remove the

---

[2] On August 1, 2014 CB&T filed its amended claim #16-2 to remove the loan numbers.

loan numbers.

To assist the Court, Buchalter Nemer ~~(BN), attorney for CB&T,~~ prepared a chart setting forth each charge and categorizing them. Ms. Licursi went through these in careful detail and then Greenberg and Bass, counsel for the Debtors, presented the comments and proposed allocations to BN. At the request of the Court, this was combined into a single chart (one chart for each billing code – A3481-0190 and A3481-0062) and presented to the Court at the hearing on September 9. The excel spreadsheets were also sent to the Court and on about September 24 the Court received revised spreadsheets from the Debtors, highlighting areas of disagreement.[3] From these the Court prepared a determination on a charge-by-charge basis. The final charts prepared by the Court are attached hereto, though a few columns have been hidden so that they could be printed out without the excessive use of paper.

Among the arguments of the Debtors is that the total fee amount is not reasonable.

Collier on Bankruptcy sums up the standard for determining reasonableness as follows:

> The courts have been fairly uniform in holding that they have inherent power to determine the reasonableness of the amount of any attorney's fees to be allowed under section 506(b) and that reasonableness is to be determined in accordance with federal standards. The bankruptcy courts will generally require the party seeking allowance of attorney's fees to carry the burden of demonstrating reasonableness by providing a detailed description of the services rendered, supporting documentation, or other evidence prior to making a determination on an application for payment. The bankruptcy court may also inquire into whether the services rendered are within the scope of the services covered by the fee provision of the applicable agreement, and whether the rendition of the services in question was reasonably required under the circumstances. (Citations omitted)

---

[3] As previously noted, the spreadsheets revised by the Debtors ~~have no been filed or entered on the docket.~~ <u>are now on the docket under dkt. #408.</u>

4 Collier on Bankruptcy 16th, ¶506.04(d).

There is no dispute that CB&T has met the physical requirements to receive its claimed fees: it has an allowed secured claim, though some of the amounts are disputed; the security agreement provides for the requested fees; and as of August 25, 2014 CB&T is oversecured, though when future attorneys' fees, interest, etc. are included, it is possible that the $325,000 valuation may not be sufficient to secure the total amount of the claim. CityBank v. Udhus (In re Udhus), 218 B.R. 513, 517 (9th Cir. BAP 1998). As to the fourth element – reasonableness – there is an undisputed descriptive billing and the services rendered were within the scope of the provision that allows them. As an active secured creditor, it may not always have been ~~reasonably~~ required for CB&T to attend §341(a) hearings and status conferences, but certainly they would need to carefully monitor this case and review and object to the disclosure statement. Because of the actions of the Licursis in this bankruptcy, it was also reasonable for CB&T to be proactive.

As noted in prior hearings and rulings, the Court itself has serious questions of the good faith of the Debtors in their plan proposals. The Malibu property is vacant, largely isolated land that they want to hold onto for possible development. They initially tried to convince the Court that it was to be used for agricultural purposes, but this was a ruse. Their most recent Plan would pay only 3.5% to unsecured creditors while they maintain their more than comfortable standard of living, which includes keeping a boat, RV, ATV, motorcycle, and a Mexico vacation home with no equity. Although last week Counsel for the Debtors advised the Court that they have now given up some of their personal property and are beginning to deal with the Mexico home, to get this far has taken much time and a great deal of pressure by the Court. For the Court it has been

like pulling teeth to get the Debtors to act realistically to create a confirmable plan and we are not there yet.

And while much of the concern of CB&T is to protect its unsecured claim, it also has a legitimate interest in making sure that the Debtors act responsibly in paying off its secured claim. Further, there is no income from the Malibu property and while there is equity for the estate, this only has value if it can be realized.  In reviewing the motion for relief from the automatic stay, the issue under §362(d)(2) is whether the property is necessary to an effective reorganization. Thus the Court continued the motion for relief from stay, trailing it with the status conferences and various attempts at a disclosure statement.  Had there been no unsecured claim, CB&T would have been entitled to 100% of its fees for much of this continued work.  But because of the existence of an unsecured claim, the 50% allocation benefits the Debtors and is not unfair to CB&T, who – given the nature of this relationship and ~~that~~ the level of mutual hostility - would certainly have been ~~just~~ almost as active if there were no secured claim.  <u>The Debtors assert that the 50-50 split does not appear in the calculations.  The Court does not agree with this.  When the Court felt that anything other than a 100% allocation is appropriate, it is so noted in that charts attached to the Partial Ruling under "Court Comments" and then mathematically calculated in the column "Amt Allowed."  It is the total of the "Amt Allowed" column that the Court used for its ruling.[4]</u>

<u>CB&T questions why the Court felt that it was fair to do the 50-50 allocation when its unsecured claim will only pay out about 3.5% and thus it would not be economically feasible to pursue it with this much diligence.  In most cases the Court would agree.</u>

---

[4] If the Debtors can point to any specific places where the Court did not do the mathematical allocation from the "Court Comments" column, I will modify the final figure to correct this.

<u>However the relationship of CB&T and the Licursis is not the more conventional one in that CB&T has aggressively pursued them through their businesses and it believes that they have defrauded CB&T by transferring assets from one business to the other. CB&T's goal as a unsecured creditor is not to sit back and hope for a few percent increase in its payout, but to get this case dismissed so that it can continue to pursue the Licursis as owners of the Spectrum entities. Thus the 50-50 allocation is appropriate.</u>

The Debtors argue that the fees are simply too high given the amount of the principal due on the secured claim, which is about $180,000+. This has not been a simple case. And while CB&T has not been willing to compromise, it has not done unnecessary work. Thus, the amount of fees is what they are and, as modified by the Court, they are reasonable under the circumstances of this case.

**Fee Calculation**

Attached ~~hereto~~ <u>to the Partial Ruling (dkt. #402)</u> are the charts showing the fees claimed by CB&T for the work of BN, the grounds of objections by the Debtors, their proposed allocation, the Court's comments and amounts awarded.[5]

In general, I determined that, according to the charts, the following will be allowed as part of the secured claim:

Account A3481-0062 - $17,121.96

---

[5] The BN billing codes are set forth on ~~doc~~. <u>dkt. #</u> 385, p. 5; the Debtors' color/number codes are on ~~doc~~. <u>dkt. #</u> 352, p.108. A summary of the category by category breakdown is on ~~doc~~. <u>dkt. #</u> 386, p.42. I attempted to change the Excel spreadsheet to include the revisions by the Debtors presented to the Court on about 9/24. But I did not copy the comments into my spreadsheet, just the percentages and the amounts. I did, however, read and consider the comments.

Account A3481-0190 - $63,876.00

Total - $80,997.94

I tried to be consistent in dividing fees between those concerning the CB&T unsecured claim and those pertaining to its secured claim on the Malibu property. As time went on, the work on Malibu took center stage, although the issues as a general unsecured creditor still remained. I also tried to take into account the comments of the Debtors and adjusted accordingly when I agreed with them. The chart is made more difficult to read because of the allocation into subparts. Thus the Debtors' proposed allocation may be on a different line from that of the Court. But these were all taken into consideration.

In response to the Partial Ruling, Debtors urge the Court to again review the amount of charges allocated to Relief from Stay; CB&T opposes. At the time of my original review, I considered whether the charges allocated to Relief from Stay were reasonable and I have not changed my mind. Thus no revision will be made.

The Debtors also object to $742.50 allocated to Adequate Protection Payments. I will sustain this objection, largely because the amount in issue is simply too small to delve deeply into whether it is warranted or not.

Determining fees is more of an art than of a science. For that reason it is especially difficult to be exact. The above amounts are the best that I can do, having reviewed each and every entry and comment and having spent no less than fifteen hours in reviewing these.

**Requests for Setoffs**

As to Ms. Licursi's claim for $22,500 setoff for her "paralegal" work. I agree with the opposition filed by CB&T on dkt. 385, p. 9 that as a Debtor-in-Possession, it is her duty to review and object to the claim.

Mr. Goodman's request for fees, on the other hand, is allowable if the Debtors are the prevailing party on this objection to claim.

"No one factor should be considered in determining the prevailing party for the purpose of attorney fees. The party that is awarded a money judgment in a lawsuit is not necessarily the successful or prevailing party." *See, In re Wilson,* 2007 Bankr. Lexis 891 (Bankr. Mo 2007). The Supreme Court notes that Black's Law Dictionary defines prevailing party as a "party in whose favor a judgment is rendered, regardless of the amount of damages awarded." *Buckhannon Bd. and Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.,* 532 U.S. 598, 603 (2001).

In this case, the Debtors are deemed to be the prevailing party as to the amount of fees that will be allowed on the secured claim. Given the amount requested as of June 17, 2014 ($4,950) it is not efficient to require detailed billings.[6] The Court is sure that by mid- June the Debtors' counsel spent at least ten hours on this work and that the hourly rate of $495 is well within the normal range for someone of Mr. Goodman's skill and experience. Some of the work concerns getting papers in proper legal form and preparing the objection. Although I am not completely sustaining the objection, the fact that CB&T took so long to divide its proof of claim between secured and unsecured portions and to similarly divide its request for fees justified Counsel's involvement.

---

[6] The Court is aware that on p.9 of dkt. 352, the amount attributed to Counsel is 10 hours, whereas in his declaration on p. 16 of dkt. 352 he states that he has worked on this for 6 hours.

Thus, the Court will offset the amount of fees by $4,950 and the $742.50 allocated to adequate protection payments, leaving the balance of $76,047.94 $75,305.44 as of August 25, 2014.

**Adequate Protection Payments**

Per the opposition, the Debtors are attempting to apply adequate protection payments to the loan balance, although these were returned. According to the Debtors' chart received by the Court on about September 24, 2014, at least one payment was never returned. The parties obviously need to work out an accounting on this.

In its Supplemental Brief (dkt. #469), CB&T asserts that it "accepted" the adequate protection payments because the Debtors created doctored preprinted deposit slips and presented the payments at the branch. It then returned the money through a cashier's check.

CB&T also asserts that it does not need to accept adequate protection payments because they were never ordered by the Court and to accept them might delay the ultimate foreclosure. This is incorrect. Although this is not a single asset real estate case and thus §362(d)(3) does not apply, there is no reason to hold that a Debtor cannot voluntarily make monthly payments to keep interest from accruing. Thus, the amount of the tendered payments cannot reduce the principal, but there can be a credit as to the accruing interest and post-petition late charges. If the Creditor wishes to hold them in a special account or in "suspense" and not immediately apply them to the loan, it may do so. But when calculating the claim for payoff, refinance, or plan purposes, these payments will be credited as through applied when received. The Debtors are to

transmit the cashier's checks back to CB&T, which is to recalculate the loan balance and accruing interest as though those payments had been credited when received.  If the Debtors failed to keep the original cashier's checks, no credit is to be given them.

**Interest**

The chart attached to the Objection to Claim (dkt. 352, p. 98) does not include non-default interest as a disputed item.  If it is disputed, the Court needs information as to the nature of the dispute.

**Default Interest**

~~If I correctly understand Exhibit G to the objection to claim (dkt. 352, p. 98), the Debtors assert that default interest is to be calculated at $24 per day.  This would mean that the amount of default interest from May 13, 2013 until June, 17, 2014 (the date that the objection was filed, which is a total of 400 days) would be $9,600.  I cannot tell what CB&T is asserting.  Further, I am not sure whether there is an issue as to the effect of refinance as a part of confirmation on the default rate of interest.  The parties are to provide the Court with a clear statement of the dispute and the basis of their respective positions.~~

The Debtors assert that the total default interest noted on the motion for relief from stay filed on August 27, 2013 was $14,446.05 from April 7, 2011 to July 31, 2013. Since there were 390 days from July 31, 2013 to August 25, 2014 and the amount at the rate of $24 per day, there should be an additional $9,360.  Thus the correct total to August 25, 2014 should be $23,806.05.[7]

CB&T agrees with the $24 per day rate, but calculates default interest from April

---

[7] The Court cannot filed the initial statement in the August 27, 2013 filings, but accepts that it is there.

7, 2011 through August 25, 2014 to total $29,694.54.

The fact that there are paragraphs in the various briefs concerning this demonstrates the level of hostility in this case. Basically, who cares what was in one paper of another. The only issue is that there are 1,236 days between April 7, 2011 and August 25, 2014; multiply that time $24 per day and the total default interest for that period should be $29,664.

**Late Charges**

~~Debtors assert that they paid all prepetition late charges. If CB&T disputes this, Debtors are to provide the Court with an accounting showing the payments. As to post-petition late charges, since Debtors assert that they may not be allowable under bankruptcy rules, please provide the Court with some points and authorities on this issue.~~

Debtors assert that the account was current at the time of filing the bankruptcy and thus there is no basis for prepetition late charges. They do not provide any legal authority as to why post-petition late charges would not be allowed.

CB&T has provided a chart that shows that the Debtors were current on principal and interest payments at the time of bankruptcy, but had not paid the accrued late charges and other fees. It also has provided the legal basis for them post-petition late charges..

It appears that the Debtors had come current through their payments of October 4 and October 13, 2010. As described below under "Foreclosure Fees," the Debtors received a letter from CB&T dated October 6, 2010 that stated as follows:

> As you know, various **"Events of Default"** (as defined in the Deed of Trust) currently exist under the Loan Documents. Most notably, among other things, an Event of Default has occurred and currently exists under the Loan Documents as

-14-

<u>a result of Borrower's failure to pay the required monthly interest payments due under the Loan for the months of August 2010 through October 2010 in the sum of $6,229.21, which amount includes late charges, appraisal fees, legal fees and other costs incurred in connection therewith, but is not representative of a full payoff ("**Interest Payment Default**").  Lender hereby instructs Borrower to deliver to Lender, on or prior to October 13, 2010, the sum of $6,229.10 with respect to the Interest Payment Default. (dkt. #407, ex. A).</u>

<u>As of October 13, 2010, CB&T had received checks totaling $6,229.10 (which they later, unjustifiably, returned).  The only confusion is that the Promissory Note is not for interest only, but states that payments include principal and interest and that monthly payments would be $1,904.58 each (a legible copy is attached as ex. 6 to the Motion for Relief from Stay (dkt. #234)).  Three months of missed payments would total $5,713.74, so it seems that the cure amount of $6,229.10 does, indeed, include the entire required monthly payments plus about $500 in other charges such as late fees, appraisal fees to that date, and legal fees.</u>

<u>Sustain the objection to the late charges.</u>

**Foreclosure Fees**

Debtors question the prepetition foreclosure fees on three grounds: that the NOD was filed in error, that the account was cured although CB&T later refunded the payments, and that the account was current at the time that the bankruptcy was filed.  ~~CB&T is to respond to these statements.~~

<u>In its Supplemental Brief (dkt. #406) CB&T attaches a copy of the invoice supporting its request for foreclosure fees of $1,516.48.  CB&T contends that the Debtors did not make any payments for August, September, October, and November 2010.  The attached loan statement shows that on November 29, 2010 the Licursis paid $7,752.93 in an attempt to catch-up.  But CB&T asserts that this did not cover accruing late fees, etc.  According to CB&T, the invoice from Fidelity National Default Services</u>

-15-

shows that the foreclosure fees (except for the notice of rescission) were actually incurred on November 10, 2010, which was before the Debtors attempted to catch-up the loan.

However, the Debtors (in their Comment on the Partial Ruling (dkt. #407)) show the demand for cure as of October 13, 2010 was a total of $6,229.21 (which is for the required monthly interest payments and includes late charges, appraisal fees, legal fees, and other costs through that date).[8]  On October 4, 2010 CB&T received a check for $2,000 and on October 13, 2010 they received a check for $4,229.27.  Thus, the Debtors assert that they were not in default when the foreclosure costs were incurred.

The further correspondence shows that on October 13, CB&T sent a new demand letter, now requiring payment of $7,594.66 to cure by October 22.  For some reason CB&T returned the Debtor's two checks on or about November 16, 2010.

It is not unusual for the accounting in a bank to create this type of confusion.  But here the evidence is that the Debtors had cured the default – including late charges, appraisal fees, legal fees, and other costs – up to October 13, 2010.  Thus the objection to the claim for foreclosure fees is sustained.

**Appraisal Fees**

Debtors would like substantiation of the appraisals billed for January 4, 2011 and for August 4, 2011.  CB&T has provided that substantiation (dkt. #406).  In their Comments on Partial Ruling the Debtors now question how many appraisals are needed on vacant land.  This objection should have been raised sooner.  But regardless of that, the value of real property was very much in flux during this case and it is not improper for the Bank to do periodic appraisals.  Overrule the objection as to the

---

[8] See above under "Late Charges."

appraisal fees.

**Legal Costs of $2,077.48**

In their Comments on Partial Ruling, Debtors object to a charge for legal costs of $2,077.48 that is included on dkt. 386, p. 2. These are fully supported by Exhibit 5 to dkt. 386. Overrule the objection..

**Sanctions Award**

On March 26, 2014 the Court ordered Debtors' prior counsel to pay CB&T the amount of $5,000 as a sanction for instituting an adversary against CB&T for violation of the automatic stay (dkt. ##341, 342). CB&T incurred fees and costs of $46,000+ in defending that adversary proceeding. Since CB&T has removed any claim for fees as to the adversary complaint, the sanctions award cannot be offset against the secured claim for fees.

## CONCLUSION

~~The amount of attorneys' fees to be added to the secured claim as of August 25, 2014 is $76,047.94.~~

~~As noted above, the respective parties are to provide the Court with specifics as to disputes on interest, default interest, foreclosure fees, and appraisal fees. This is to be filed no later than October 8, with any response due by October 13.~~

~~The sanctions award is not a setoff, nor is the time spent by Ms. Licursi in analyzing the fee request. However, there will be a credit of $4,950 for fees incurred as to Mr. Goodman.~~

Using the itemized payoff statement format submitted by CB&T (dkt. #386, p.2), as of August 25, 2014, the amounts owed to CB&T on its claim secured by the Malibu property are as follows:

| ITEM | AMOUNT | COMMENTS |
| --- | --- | --- |
| PRINCIPAL | $172,776.44 | This may be reduced by crediting the adequate protection payments if the Debtors transmit the cashier's checks back to CB&T |
| INTEREST (to 8/25/14) | $42,852.98 | This may be reduced by crediting the adequate protection payments if the Debtors transmit the cashier's checks back to CB&T |
| DEFAULT INTEREST (to 8/25/14) | $29,664 | 1,236 days at $24 per day |
| LATE CHARGES | $0 | Included in the cure amount of October 4, 2010 and October 13, 2010 |
| LEGAL FEES (to 8/25/14) | $75,305.44 | |
| LEGAL COSTS (to 7/31/14) | $2,077.48 | These are substantiated on dkt. #386, ex. 5 |
| FORECLOSURE FEES | $0 | Default cured on October 13, 2010 before the foreclosure fees were incurred |
| APPRAISAL FEES | $8,850 | Back-up provided |
| TITLE & RECORDING FEES | $1,593.94 | No objection |
| TOTAL | $333,120.28 | This will certainly continue to escalate, but fees, interest, and costs are – by definition – a moving target. So this at least gives the Debtors a general idea of the minimum that they must obtain to pay off CB&T on its secured loan. |

As a final admonition to the parties: I have analyzed this to the best of my ability,

taking into consideration each objection and each support. However, it is possible that I may have missed some small item(s). Before filing another round of papers, please do a cost/benefit analysis as to whether a positive outcome would justify the time and attorneys' fees to be incurred. If I believe that the issues raised are picayune and the potential benefit is *de minimus*, I will take that into consideration in awarding fees to the other side even if it does not seem to be the prevailing party.

###

Date: October 17, 2014

Geraldine Mund
United States Bankruptcy Judge